**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALEXEY KASHRANOV** | |
| *Plaintiff,* | |
| v. | **Case No. 2:25-cv-05555-JDW** |
| **J.L. JAMISON, et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

Due process is a hallmark of the American justice system. Everyone, including aliens who entered the country illegally, is entitled to due process protection. Alexey Kashranov is no exception. He entered the country illegally and has sought asylum. He lived here for almost two years, with the Government's knowledge, but the Government detained him in September 2025. Since then, it has held him without a bond hearing on the theory that the Immigration And Nationality Act makes his detention mandatory. But mandatory detention only applies for aliens who are "seeking admission," and Mr. Kashranov is already here. I will therefore grant his petition for habeas corpus and order his release. If the Government seeks to detain him, it must make an individualized determination about its need to detain him and give him the due process to which he is entitled and that our legal system demands.

## I.    BACKGROUND

### A.    The INA's detention provisions

Two provisions of the INA provide for detention of noncitizens during removal proceedings: 8 U.S.C. §§ 1225 and 1226. The INA is a complex statute that Congress has reworked many times since 1952. Congress added the key language in the two provisions at issue in 1996, when it passed the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-208. Section 1225, titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing," applies to "applicants for admission." 8 U.S.C. § 1225(a)(1). Such applicants "fall into one of two categories: those covered by Section 1225(b)(1) and those covered by Section 1225(b)(2)." *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018).

Section 1225(b)(2), which the Government invokes in this case, is titled "Inspection of other aliens" and provides that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). Noncitizens subject to this provision are subject to mandatory detention while their full removal proceedings are pending and may be released only "for urgent humanitarian reasons or significant public benefit." *Jennings*, 583 U.S. at 288 (quoting 8 U.S.C. § 1182(d)(5)(A)). The Supreme

Court has described Section 1225(b)(2) "as a catchall provision that applies to all applicants for admission not covered by [section] 1225(b)(1)." *Id.* at 287.

Section 1226, by contrast, is titled "Apprehension and detention of aliens" and provides the Attorney General with discretion to arrest and detain noncitizens, save for those individuals that fall under the statutory exceptions set forth in Section 1226(c). 8 U.S.C. § 1226(a). Under this provision, the Government may "continue to detain the arrested alien" or release the alien on bond or conditional parole. *Id.* § 1226(a)(1)-(2). Immigration authorities make an initial custody determination, after which the noncitizen may request a bond hearing before an immigration judge. 8 C.F.R. § 1236.1(c)(8), (d)(1). At that hearing, the noncitizen "may secure his release if he can convince the officer or immigration judge that he poses no flight risk and no danger to the community." *Nielsen v. Preap*, 586 U.S. 392, 397–98 (2019) (citations omitted). If released, the bond remains subject to revocation under Section 1226(b). 8 U.S.C. § 1226(b).

B.    **Mr. Kashranov's detention**

Mr. Kashranov is a Russian citizen and a member of the Kalmyk ethnic group from the Republic of Kalmykia. Mr. Kashranov and his wife opposed Russia's war in Ukraine on religious and moral grounds. They also supported opposition leader Alexei Navalny and participated in his voting program for the Anti-Corruption Foundation. Fearing conscription and persecution for his religious and political views, Mr. Kashranov fled Russia with his wife and daughter in October 2022.

The family traveled to Spain, then Cuba, then Mexico. On December 3, 2023, they entered the United States near the southern border through a gap in the fencing and soon encountered Customs and Border Protection officers. After they presented their passports to those officers, the officers took them into custody. At the time, Mr. Kashranov's wife and daughter were ill with high fevers. The officers placed them in medical isolation for two days at an immigration detention center.

After two days, immigration officials placed the family in removal proceedings. They issued Mr. Kashranov an Order of Release on Recognizance under Section 236 of the Immigration and Nationality Act, and he was released. That same day, immigration authorities served Mr. Kashranov with a Notice to Appear, directing the family to attend a hearing before the Immigration Court in Philadelphia on May 21, 2025.

Once released, the family relocated to Philadelphia. In December 2024, Mr. Kashranov and his wife welcomed a son. Since arriving, Mr. Kashranov has worked as an AutoCAD designer with Mark Residential in Philadelphia. He also attends Cooper Union in New York in the Retraining Program for Immigrant Engineers on a full scholarship. Mr. Kashranov and his wife filed asylum applications in early 2024, which remain pending.

On September 24, 2025, while attending a routine appointment at the ICE office in Philadelphia with his attorney and family, ICE officers arrested Mr. Kashranov without prior notice under an administrative "Warrant for Arrest of Alien." (ECF No. 7-7.) The Warrant is directed to "[a]ny immigration officer authorized pursuant to sections 236 and 287 of the

Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations." (*Id.*) It states that there is probable cause to believe that Mr. Kashranov is "removable from the United States ... based upon ... the pendency of ongoing removal proceedings" against him. (*Id.*) ICE detained him at the Federal Detention Center in Philadelphia and transferred him to Pike County Correctional Facility four days later. On October 20, 2025, an Immigration Judge denied his request for a custody redetermination hearing, citing *Matter of Yajure Hurtado*, 29 I&N 216 (BIA 2025), in which the Board of Immigration Appeals held that immigration judges lack authority to hear bond requests for aliens present in the United States pursuant to 8 U.S.C. § 1225(b)(2).

### C.    Procedural History

Believing his mandatory detention to be unlawful, Mr. Kashranov filed this petition for a writ of habeas corpus on September 26, 2025, while detained at Pike County Correctional Facility. He has no criminal history, and no bond hearing has been held to determine whether he poses a risk of flight or danger to the community. The petition, brought against officers and agencies responsible for enforcing federal immigration laws, alleges violations of the Fifth Amendment right to due process, the INA, and the Administrative Procedure Act, stemming from his detention without a bond hearing. Mr. Kashranov asks the Court to issue a writ ordering the Government to release him from custody or, in the alternative, to provide him with a bond hearing.

On October 28, 2025, Mr. Kashranov filed a Motion For Temporary Restraining Order And Preliminary Injunction, arguing that his continued detention causes irreparable emotional and financial harm and requesting that the Court release him and enjoin the Government from detaining him without a pre-deprivation hearing. The Government opposed the petition and Motion, urging dismissal for lack of subject matter jurisdiction under various INA provisions and the exhaustion doctrine. It also asserts that Mr. Kashranov is subject to mandatory detention under 8 U.S.C. § 1225(b)(2) as an "applicant for admission" not clearly entitled to enter the United States. I heard oral argument on November 10, 2025, at which the Parties agreed I should resolve the case on the merits.

## II.    LEGAL STANDARD

A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where the petitioner is "in custody under or by color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(1), (3). The burden is on a petitioner to show that he is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3); *Walker v. Johnston*, 312 U.S. 275, 286 (1941).

## III.    ANALYSIS

### A.    Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They have an independent duty to confirm that

subject matter jurisdiction exists before proceeding with an action. *Steel Valley Auth. v. Union Switch and Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987). If jurisdiction is lacking, a judge must dismiss the case, as it "call[s] into question the very legitimacy of a court's adjudicatory authority." *Council Tree Comm'ns, Inc. v. FCC*, 503 F.3d 284, 292 (3d Cir. 2007).

### 1.    Jurisdiction stripping statutes

28 U.S.C. § 2241 empowers federal courts to grant writs of habeas corpus and therefore gives the Court jurisdiction to consider Mr. Kashranov's petition. However, the INA contains several provisions limiting the authority of federal courts in immigration matters. *Jennings*, 583 U.S. at 292–96. The Government invokes 8 U.S.C. §§ 1252(a)(5), 1252(g), and 1252(a)(2)(B)(ii) to challenge this Court's authority. None however, strips the Court's jurisdiction to determine the statutory basis for Mr. Kashranov's detention or to assess whether his continued detention without a bond hearing violates his constitutional rights.

### a.    Section 1252(g)

8 U.S.C. § 1252(g) provides that "[e]xcept as provided in this section and notwithstanding any other provision of law … no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." The Supreme Court has held that Section 1252(g)

has a narrow scope. The provision does not sweep in every claim that can technically "arise from" those actions but refers to "just those three specific actions themselves." *Jennings*, 583 U.S. at 294 (citation omitted); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). Mr. Kashranov does not challenge the commencement of removal proceedings, the Attorney General's decision to adjudicate his case, or the execution of a removal order. Instead, he contests the Government's legal authority to detain him under Section 1225(b)(2). Section 1252(g) does not apply to such a claim and therefore does not strip the Court of jurisdiction to hear this case.

### b.    Section 1252(b)(9)

Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States ... shall be available only on judicial review of a final order" of removal and that "no court shall have jurisdiction, by habeas corpus under [28 U.S.C. § 2241] or any other habeas corpus provision ... to review such an order or such questions of law or fact." 8 U.S.C. § 1252(b)(9). The Supreme Court has described this provision as an unmistakable "zipper" clause that channels judicial review of all decisions and actions arising from removal proceedings. *Reno*, 525 U.S. at 481. At the same time, the Court has cabined the "arising from" language in this provision, clarifying that Section 1252(b)(9) bars review only for petitioners "asking for review of an order of removal," "the decision to detain

them in the first place or to seek removal," or "the process by which their removability will be determined." *Jennings*, 583 U.S. at 294–95.

The plain language of Section 1252(b)(9) makes clear that the provision does not apply here. Mr. Kashranov is not asking the Court to review a question of law or fact arising from any removal proceedings. He challenges the Government's interpretation of the statutory detention framework mandating his detention without a bond hearing. Thus, Section 1252(b)(9) is also not an issue.

### c.    Section 1252(a)(2)(B)(ii)

Section 1252(a)(2)(B)(ii) precludes district court review of decisions by the Attorney General or Secretary of Homeland Security "the authority for which is specified under this subsection to be in [their] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). But this case does not involve any such exercise of discretion. The petition does not challenge a discretionary choice to detain Mr. Kashranov. Instead, there's a pure legal question about which section governs. If it's 1225(b), then detention is mandatory. No discretion. If it's 1226, then due process protections apply, and a bond hearing is mandatory. No discretion. Either way, the dispute is about the scope of the Government's statutory detention authority, which, as the Supreme Court has made clear, is "not a matter of discretion." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).

2.      **Exhaustion**

Ordinarily, a petitioner challenging agency action must first exhaust available administrative remedies. But no statute requires exhaustion in habeas proceedings under § 2241. Instead, exhaustion exists only as a judicially created doctrine applied at the Court's discretion. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992). Requiring Mr. Kashranov to pursue further administrative review would serve no practical purpose considering the BIA's recent decision in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (B.I.A. 2025). In that case, the BIA held that Section 1225(b)(2) governs the detention of all noncitizens who are subject to removal proceedings, but not on parole, on the basis that they are "seeking admission" for purposes of the detention statutes. *Id.* at 221. Because all noncitizens subject to Section 1225(b)(2)(A) must be detained and are ineligible for a bond hearing, the BIA concluded that "Immigration Judges lack authority to hear bond requests or to grant bond" for these individuals.[1] *Id.* at 225. Unless the BIA revisits or alters its ruling, this holding would preclude Mr. Kashranov from obtaining a bond hearing even if he sought further administrative review. Indeed, during oral argument, the Government acknowledged that, given the recency of *Yajure Hurtado*, the BIA is unlikely to reconsider the decision soon. Because the agency has already fixed its position, exhaustion becomes

---

[1] The BIA has no authority to bind this Court, which must undertake its own review of the statutory issues presented here. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

an empty formality. *McCarthy*, 503 U.S. at 148. Under these circumstances, there is good cause to excuse exhaustion.

### B.    Merits

When construing a statute, a court must begin "with the statutory text and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 559 U.S. 369, 376 (2013) (cleaned up). When Congress defines a statutory term, courts must use that definition. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 697 n.10 (1995). When Congress does not define a term, a court may consider dictionary definitions to ascertain the term's meaning, with a focus on the term's meaning when Congress enacted the statute. *Tanzin v. Tanvir*, 592 U.S. 43, 48-49 (2020). When the meaning of a statute's terms is clear, the inquiry is at an end because the "people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cty.*, 590 U.S. 644, 673-74 (2020).

Judges should, whenever possible, construe a statute "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). "[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 576 U.S. 473,

486 (2015) (internal quotation marks and citation omitted). Accordingly, "[t]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Courts must "use every tool at their disposal to determine the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Applying these principles to the INA, I conclude that the Government could only have detained Mr. Kashranov under Section 1226, not Section 1225(b).

### 1.    Section 1226(a) applies to the Government's detention of Mr. Kashranov

Section 1226(a)[2] grants the Attorney General discretion to detain or release a noncitizen on bond while removal proceedings are pending. On its face, the statute applies to Mr. Kashranov's situation. His arrest occurred pursuant to a warrant that DHS issued. The warrant itself cites "section[] 236 ... of the Immigration Nationality Act," which is Section 1226.[3] (ECF No. 7-7.) And, as Section 1226 contemplates, the warrant provides for his detention pending the outcome of his removal proceedings (and asylum application). The Government's argument that it detained Mr. Kashranov pursuant to

---

[2] Although it is unclear whether Mr. Kashranov was arrested under the original warrant that would have followed a revocation of a bond under Section 1226(b) or under a new warrant issued pursuant to Section 1226(a), the distinction is immaterial and does not affect the process owed to him.

[3] To be clear, I am not basing this ruling on some suggested estoppel from the Government's citation of Section 1226. But the Government's citation of that statute bolsters my conclusion that Section 1226 applies to Mr. Kashranov's circumstances.

Section 1225 ignores this evidence. Also, while the Government invokes Section 1225(b), it makes no argument as to why Section 1226(a) would not apply to Mr. Kashranov's situation.

When the Government detains an alien under Section 1226, the alien has due process rights, including a right to an individualized detention determination and a bond hearing. *See* 8 C.F.R. § 1236.1(c)(8), (d). At the hearing, the Government conceded that if Section 1226 governs, then Mr. Kashranov has due process rights and that Mr. Kashranov did not get the required process.

That concession makes sense because the "Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. To determine whether a government action violates due process, courts apply the *Mathews v. Eldridge* balancing test, which weighs: (1) the private interest implicated by the government action; (2) the risk of an erroneous deprivation and the probable value of additional safeguards; and (3) the Government's interest, including administrative burdens of additional procedures. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). In this case, all three *Matthews* factors weigh in favor of Mr. Kashranov. He has a strong liberty interest. The lack of any individualized assessment creates a high risk of error. And a bond hearing imposes minimal administrative burden. The *Mathews* factors therefore indicate that due process compels a pre-deprivation bond hearing.

### 2. Section 1225(b)(2) does not apply to the Government's detention of Mr. Kashranov

Although the Government doesn't dispute that Section 1226(a) applies in this case, it contends that Section 1225(b)(2) also applies and excuses the need for a bond hearing. To trigger Section 1225(b)(2)(A), an examining immigration officer must determine three elements: that the individual is (1) an "applicant for admission," (2) "seeking admission," and (3) "not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A); *see Martinez v. Hyde*, 792 F. Supp. 3d 211, 214 (D. Mass. July 24, 2025). Section 1225(a)(1) defines the first element. It provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States … shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). Through this language, Congress directs courts and immigration authorities to treat any alien who is present in the United States without lawful entry, or who arrives at the border, as having applied for lawful admission even if the person did not submit a formal application. As one court put it, "[a]ll that's needed is presence without admission." *J.G.O. v. Francis*, No. 25-CV-7233 (AS), 2025 WL 3040142, at *3 (S.D.N.Y. Oct. 28, 2025).

But Section 1225(b)(2)(A) applies only to an alien who is **both** an applicant for admission and "seeking admission." The INA defines the term "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). But it does not define "seeking" or

"seeking admission." So, I must look to the plain meaning and statutory context to understand the phrase.

The phrase "seeking admission" functions as a present participial modifier of the term "alien" within the statute. *See J.A.M. v. Streeval, et al.*, No. 4:25-CV-342 (CDL), 2025 WL 3050094, at *3 (M.D. Ga. Nov. 1, 2025). To unpack the phrase more fully, when Congress added the term "seeking admission" to the INA in 1996, the verb "seek" was an active verb and means "to try to acquire or gain." Seek, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996).[4] The present participle, expressed in the progressive "-ing" form, conveys ongoing and continuous action rather than a completed or static state. *Ochoa Ochoa v. Noem*, No. 25 CV 10865, 2025 WL 2938779, at *6 (N.D. Ill. Oct. 16, 2025); *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (B.I.A. 2020). Taken together, then, "seeking admission" means *actively* trying to acquire or gain "lawful entry ... after inspection and authorization by an immigration officer."

That only partially answers the question, though, because it leaves open the question of what "entry" means. Congress added the definition of "admission," including the word "entry," in 1996 when it amended the INA, but it didn't define "entry." At the time, the dictionary defined "entry" as "the act of entering." Entry, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996). It defined "entering," in turn, as "[t]o come or go

---

[4] The definition hasn't changed meaningfully in the 29 years since Congress added the term to the INA.

in." Enter, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996). Another source from around that time defines it in the immigration context as "any coming of an alien into the U.S. from a foreign part or place or from an outlying possession, whether voluntary or otherwise." Entry, BLACK'S LAW DICTIONARY (6th ed. 1990). These definitions show that "entry" refers to a physical act of crossing into a place, emphasizing tangible movement rather than legal status.

Viewed in this light, "seeking admission" describes active and ongoing conduct—physically attempting to come into the United States, typically at a border or port of entry and presenting oneself for inspection and authorization. This reading preserves the distinction between "seeking admission" and the separate term "applicant for admission," ensuring that each phrase carries independent meaning. While Mr. Kashranov is an applicant for admission, he is not seeking admission. He's already here.

The statutory context reinforces this conclusion. *First*, the structure and placement of Section 1225 within the INA make clear that Congress designed this provision to govern inspections and detentions of aliens at the border. Section 1225(b)(2) is titled "Inspection of other aliens," reflecting a process that occurs when an individual presents for entry into the United States. 8 U.S.C. § 1225(b)(2); 8 C.F.R. § 235.1(a). That interpretation is confirmed by the immediately following subsection, Section 1225(b)(2)(C), which addresses the "[t]reatment of aliens arriving from contiguous territory." The reference to persons "arriving on land ... from a foreign territory contiguous to the United States" again situates

16

Section 1225(b)(2) within the context of border entry. 8 U.S.C. § 1225(b)(2)(C). The surrounding subparagraphs reinforce this conclusion because subparagraph (B) excludes "an alien … who is a crewman" or "who is a stowaway," while subparagraph (C) authorizes the AG to return to a contiguous territory "an alien described in subparagraph (A) who is arriving on land." *Id*. § 1225(b)(2). Section 1225(b)(2) therefore contemplates inspection and detention at or immediately following border crossing.

*Second*, 8 U.S.C. § 1101(a)(13)(C) provides additional context confirming that the phrase "seeking admission" is tied to border entry. Section 1101 provides the INA's operative definitions, including the rule that a lawful permanent resident is not regarded as "seeking *an* admission" upon return to the United States unless certain enumerated exceptions apply. 8 U.S.C. § 1101(a)(13)(C) (emphasis added). As the Third Circuit explained, "§ 101(a)(13)(C) provides aliens, who have previously been admitted and hold legal permanent resident status, with an exception" to the rule that they establish clearly and beyond a doubt entitlement to be admitted "when they seek to reenter the United States at a port of entry after temporarily leaving the country." *Taveras v. Att'y Gen. of U.S.*, 731 F.3d 281, 289-290 (3d Cir. 2013).

The structure of § 1101(a)(13)(C), together with the Third Circuit's interpretation, demonstrates that Congress intended the provision to operate at the border. The provision distinguishes lawful permanent residents who return from brief trips abroad from those whose conduct renders them "seeking an admission" again. By extension, the

phrase "seeking admission," without the indefinite article, similarly describes a border-focused process.

In its briefing, the Government never addresses the central question of whether "seeking admission" and "applicant for admission" mean different things. At oral argument, when I asked whether a meaningful difference exists, the Government insisted that "seeking admission" is a grammatical extension of "applicant for admission" and imposes no independent requirement. In effect, the Government asks me to treat two distinct statutory phrases as interchangeable. That argument is easy to state but ignores the cannon against surplusage, one of the standard tools of statutory construction. *Pulsifer v. United States*, 601 U.S. 124, 143 (2024).

If the Government were correct, and "applicant for admission" and "seeking admission" were truly interchangeable, Congress would have had no reason to use two distinct terms. Treating the phrases as identical would render one entirely meaningless. That is the very definition of surplusage. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Congress chose its words deliberately, and I must respect that choice. *See Henson v. Santander Consumer USA Inc.,* 582 U.S. 79, 86 (2017) Several district courts across the country have also rejected the Government's reading, holding that Section 1225(b)(2)(A) does not apply to individuals like Mr. Kashranov who have already entered and resided in the United States for an extended period. *See, e.g., Soto v. Soto, et al.*, No. 25–cv–16200,

2025 WL 2976572, at *5 (D.N.J. Oct. 22, 2025) (collecting cases). I therefore reject the Government's argument that Section 1225(b)(2) applies to Mr. Kashranov's detention.

### C.    Remedy

As a general matter, a habeas court has "the power to order the conditional release of an individual unlawfully detained—though release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008). Because the Government detained Mr. Kashranov without the bond hearing that Section 1226(a) and the Due Process Clause require, Mr. Kashranov should not now be in custody. I will also permanently enjoin the Government from re-detaining him under Section 1225(b)(2)(A) and temporarily enjoin the Government from re-arresting him under Section 1226(a), for seven days following his release to ensure the habeas remedy is effective and to allow him to return home to Philadelphia. Mr. Kashranov may move to reopen this matter if the Government seeks to detain him under Section 1226(a) and fails to schedule a timely bond hearing in which an IJ assesses whether he poses a flight risk or a danger to the community.

### IV.    CONCLUSION

I will grant Mr. Kashranov's petition on the grounds that his mandatory detention without a bond hearing violates the INA and the Due Process Clause of the Fifth Amendment. Having done so, it is unnecessary to address the remaining arguments

concerning the alleged violations of the APA and the Bond regulations. An appropriate

Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

November 14, 2025